UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **STEVEN JOSEPH RODNEY** | **CASE NO. 3:23-CV-00555 SEC P** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **J. HEDGEMON, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion for Summary Judgment [doc. # 22] filed by Defendants Warden Johnny Hedgemon and Assistant Warden Russell. The motion is unopposed. For reasons set forth below, **IT IS RECOMMENDED** that the Motion for Summary Judgment be **GRANTED** and all claims against Defendants be **DISMISSED WITH PREJUDICE**.

### Background

Plaintiff Steven Joseph Rodney ("Rodney") instituted this action on April 27, 2023, seeking a preliminary injunction and punitive damages in the amount of $30,000 against Defendants Warden J. Hedgemon ("Hedgemon"), Assistant Warden Russell ("Russell"), and Captain Barnes ("Barnes"). [doc. #1]. At the time of filing his Complaint, Rodney had been an inmate at Riverbend Detention Center ("RDC") for approximately thirteen months. *Id.* at p. 3.

This Court issued a Memorandum Order that directed Rodney to amend his Complaint to cure deficiencies the Court had found. [doc. #7]. Rodney filed his Amended Complaint on July 31, 2023. [doc. # 8]. This suit arises from the total ban of all books, magazines, newspapers, etc.

from being mailed into RDC. (Complaint [doc. #1, p. 3]). Rodney alleges this ban has been in place for several years. *Id.* The ban applies to all inmates. (Amended Complaint [doc. #8, p. 2]).

The ban is said to be due to prisoners' attempting to smuggle contraband into RDC through the books, magazines, and newspapers received through the mail. (Complaint [doc. #1, p. 3]). While Rodney concedes that the "goal is supported and understood," he posits that "an improvement of methods that make the contraband more identifiable may be the more appropriate response." *Id.* at p. 3. Rodney asserts that this is a violation of his constitutional rights. *Id.* When Rodney attempted to discuss the ban with Russell and Barnes and inform them that it is unconstitutional, Russell responded that he is in charge, "not the constitution." *Id.* Barnes responded to Rodney by stating that inmates were to blame for the ban and that there would "not be a book allowed as long as he had his way." *Id.* at pp. 3-4.

RDC does have a kiosk with a law library, but the "application is very limited and very difficult to navigate without some sort of training . . ." (Amended Complaint [doc. #8, p. 1]). Additionally, Rodney states that there is a "brick and mortar library[,]" but it is "shrouded in confusion on the point of admittance." *Id.* "The supposed schedule is prone to the officers' whims. Visits to this place are invariably cancelled and never re-established." *Id.*

A Report and Recommendation was issued by this Court on August 21, 2023, recommending that all claims against Barnes be dismissed and Rodney's access to court claim be dismissed. [doc. #10]. The Report and Recommendation was adopted on September 11, 2023. [doc. #11]. Only Rodney's First Amendment claims against Hedgemon and Russell (collectively, "Defendants") remains.

On April 3, 2024, Hedgemon and Russell filed a Motion for Summary Judgment seeking dismissal of Rodney's claims against them. [doc. #22]. They contend the prison regulation at issue is reasonable and constitutionally sound. (Memo in Support of MSJ [doc. #22-2, p. 1]). The regulation was created out of "necessity to deter the introduction of illegal drugs into the facility and due to an inability to accomplish that goal through less restrictive means." (Statement of Uncontested Facts [doc. #22-1, p. 1]). Defendants assert that the primary means inmates have attempted to introduce illegal drugs into RDC has been through the mail. *Id.*

Specifically, people "on the outside" will soak or spray the pages of books, magazines, or letters with liquified narcotics and then mail those items to the inmates. *Id.* at p. 2. In an attempt to combat that practice, RDC instituted a policy of searching the mail that enters the facility. *Id.* The process of searching books overwhelmed the RDC staff because every page had to be closely examined. *Id.* Reviewing every page of each book became untenable given the limited staff available. *Id.* RDC staff also became ill from handling contaminated mail. *Id.* To address these issues, the policy prohibiting inmates from receiving books in the mail was implemented. *Id.* at p. 3.

Defendants assert that inmates are not without reading material, even with strict enforcement of the policy. *Id.* RDC solicits and accepts donations of books from local organizations. *Id.* Books provided by those organizations are placed on carts that are brought around to the housing units where inmates can borrow the books. *Id.* Defendants submit that they are entitled to judgment in their favor as a matter of law and that the claims made against them should be dismissed with prejudice.

On May 14, 2024, Rodney requested an extension of time to file a response to the motion for summary judgment. [doc. #24]. The Court granted Rodney's motion [doc. #25], but Rodney failed to ever file a response to the motion for summary judgment.

Accordingly, the matter is ripe.

## **Summary Judgment Standard**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at

255. While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in any *case* 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Id.* (emphasis in original). In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

Finally, when a movant bears the burden of proof on an issue, he must establish "beyond peradventure[1] all of the essential elements of the claim . . . to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must

---

[1] I.e., beyond doubt.

affirmatively establish his right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271, at *2 (5th Cir. 1993).

## Analysis

"[A] prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system'" *Turner v. Safley*, 482 U.S. 78, 95 (1987) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Accordingly, prisoners and their correspondents enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are "'reasonably related to legitimate penological interests.'" *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989) (quoting *Turner*, 482 U.S. at 89). In assessing the "reasonableness" of a prison regulation that infringes on First Amendment interests, a court must consider four factors: (1) whether the regulation is "rationally related" to a legitimate penological goal; (2) whether alternative means of exercising First Amendment rights remain open; (3) the impact that accommodating the asserted right will have on other prisoners and prison employees; and (4) whether there are easy and obvious alternative means of accommodating the asserted right. *Id.* at 414-18. "[R]ationality is the controlling factor," *Mayfield v. Texas Department of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008), and the remaining factors are best understood as indicators of rationality. *See Scott v. Mississippi Dep't of Corr.*, 961 F.2d 77, 80-81 (5th Cir. 1992).

The Supreme Court has also instructed that it is "'important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion.'" *Thornburgh*, 490 U.S. at 415 (quoting *Turner*, 482 U.S. at 90). This neutrality requirement means that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Id.* (citation omitted). Prison regulations that

"draw distinctions between publications solely on the basis of their potential implications for prison security" are facially neutral in the relevant sense. *Id.* at 415-16.

Rodney bears the burden of demonstrating that the regulation, as applied, is not reasonably related to a legitimate penological objective or constitutes an "exaggerated response" to such concerns. *Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Turner*, 482 U.S. at 87). However, Rodney has not provided any response explaining why the regulation fails to meet this standard. "[I]f no response to the motion for summary judgment has been filed, the court may find as undisputed the statement of facts in the motion for summary judgment." *Gonzales v. Abdurasulov*, No. 3:22-CV-00654, 2022 WL 2717633, at *1 (W.D. La. July 13, 2022). Accordingly, the Court treats the evidence presented by the moving party, Defendants here, as undisputed.

"Moreover, courts must give 'substantial' deference to prison official's judgment." *Prison Legal News* 683 F.3d at 215 (quoting *Overton*, 539 U.S. at 132). Defendants must do more, however, than merely show "a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). They must show a reasonable relation in light of the "importance of the rights" at issue. *Id.* at 533. To be entitled to summary judgment, then, the record must be "sufficient to demonstrate that the Policy is a reasonable one." *Id.*

*(1) Rationally Related*

Defendants have offered uncontroverted summary judgment evidence that the regulation on receiving books through the mail is rationally related to a legitimate penological interest in maintaining RDC's security. As the Supreme Court has emphasized, "[m]aintaining institutional

7

security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 521 (1979). "'[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'" *Id.* at 546-47 (quoting *Pell*, 417 U.S. at 823). The problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. *Id.* at 547. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and disciple and to maintain institutional security. *Id.* (citing *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 128 (1977)).

The record demonstrates that RDC faced a significant security threat: pages of books were being sprayed with narcotics, creating a substantial risk to staff and inmates alike. In just the first three months of 2024, RDC staff intercepted eight mail items containing narcotics concealed in this manner. (Declaration of Hedgemon [doc. #22-3, p. 2]). This misuse of mailed books posed not only a logistical burden on an already limited staff, who were tasked with inspecting every page of each book, but also a direct threat to staff safety, as they began experiencing symptoms of illness caused by exposure to the narcotics. *Id.* Moreover, there is simply no evidence in the record to indicate that RDC officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. *See Wolfish*, 441 U.S. at 548.

The Supreme Court requires that prison regulations operate in a neutral fashion. *Thornburgh*, 490 U.S. at 415. RDC's regulation operates neutrally, without regard to the content of the books or the expression therein and applies universally to all books received through the

8

mail. This uniform application ensures that the rule is not used to suppress specific ideas or viewpoints, but instead addresses the security risks posed by contraband concealed in mailed books.

Importantly, this is not a total ban on inmates' access to books. RDC facilitates access to reading materials by soliciting books from local organizations and placing them on carts for inmates to borrow and read. (Declaration of Hedgemon [doc. #22-3, p. 2]). Additionally, inmates have access to a kiosk containing a law library, as well as a brick-and-mortar library that contains a broader selection of legal books and resources. (Amended Complaint [doc. #8, p. 1]). These alternatives ensure that inmates can continue to access both recreational and legal reading materials without compromising institutional security. The declaration of Hedgemon further confirms that "Rodney has access to these books." (Declaration of Hedgemon [doc. #22-3, p. 2]).

Accordingly, the Court finds that RDC's regulation is rationally related to a legitimate penological interest in maintaining RDC's security.[2]

*(2) Alternative Means Remain Open to Inmates*

The second *Turner* factor— "where there are alternative means of exercising the right that remain open"—weighs in favor of Defendants. *Turner*, 482 U.S. at 90. The challenged RDC regulation provides prisoners with alternatives for exercising their First Amendment rights. In evaluating such alternatives, the Supreme Court has emphasized that the right in question must be

---

[2] Given that RDC is able to solicit books and materials from local organizations, it seems reasonable to suggest that they could also safely receive books directly from publishers to address both security concerns and inmates' access to materials. *See Wolfish*, 441 U.S. at 521 (finding that a publisher-only rule, which allowed books to be mailed directly from a publisher, was a rational response "to the obvious security problem of preventing the smuggling of contraband in books sent from the outside"). Nevertheless, under the undisputed facts presented, the undersigned finds that the regulation on books received in the mail is constitutionally sound.

construed "expansively," meaning that adequate alternatives need not be perfect substitutes for the curtailed rights. *Prison Legal News*, 683 F.3d at 218.

Here, RDC offers multiple avenues for inmates to access reading materials and legal resources. The facility accepts book donations from local organizations. (Declaration of Hedgemon [doc. #22-3, p. 2]). These books are then placed on carts that are brought around to the housing units where inmates can then select the books they would like to read. *Id.* Additionally, inmates have access to a kiosk within the housing units that serves as a digital law library. (Amended Complaint [doc. #8, p. 1]).

The prison also maintains a "brick and mortar" library with a more comprehensive collection of legal materials. *Id.* However, access to this facility is limited and subject to the discretion of prison officials. *Id.* While this regulation could pose challenges for inmates requiring more specialized legal resources, it does not undermine the overall availability of alternatives. Courts have recognized that practical limitations in a prison setting, such as logistical or security concerns, may justify certain regulations, provided that inmates retain meaningful ways to exercise their rights. Here, the combination of books carts, kiosks, and the library itself reflects an effort to balance inmate access with institutional needs.

Accordingly, this factor weighs in favor of finding that the regulation is reasonably related to a legitimate penological objective.

*(3) Impact Accommodations Would Have on Inmates and Prison Employees*

This consideration examines the impact that accommodating the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally. *Turner*, 482 U.S. at 90. "In the necessarily closed environment of the correctional institution, few changes

10

will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id.* Courts should be deferential to the informed discretion of corrections officials when the accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff. *Id.*

Allowing unrestricted entry of books into the prison poses significant challenges for institutional order and safety. RDC officials previously attempted to accommodate prisoners' access to receiving books via mail by inspecting every page of every book that entered the facility. (Declaration of Hedgemon [doc. #22-3, p. 2]). However, this process proved unworkable due to the severe strain it placed on already limited staff resources. The time and manpower required to perform such inspections diverted attention from other essential duties necessary for maintaining institutional order.

The risks associated with contraband entering the facility further justify RDC's current policy. Allowing contraband such as drugs into the prison endangers both inmates and staff. Drug use among prisoners can exacerbate health issues, contribute to violence, and destabilize the inmate population, creating safety risks for everyone. Staff members are directly impacted as they must address increased medical emergencies, deescalate drug-related altercations, and manage the heightened security risks associated with the contraband.

Accordingly, this factor weighs in favor of finding that the regulation is reasonably related to a legitimate penological objective.

*(4) Easy and Obvious Alternative Means of Accommodating the Asserted Right*

"[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. Moreover, "prison officials do not have to set up and then

shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. However, if a claimant is able to show that there is an alternative that accommodates their asserted right "at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

Rodney has presented no evidence or support to show that an alternative exists for RDC to prevent contraband from entering the facility. In fact, the record demonstrates that RDC officials have already attempted alternative measures, but none proved feasible. (Declaration of Hedgemon [doc. #22-3, p. 2]). Specifically, RDC staff previously implemented a policy of inspecting every page of every book that entered the facility. *Id.* This method was resource intensive and caused health issues among staff, even after attempts to mitigate those risks by using safety measures such as gloves and masks. *Id.*

Additionally, RDC faces significant staffing limitations, which further hinders its ability to implement labor-intensive alternatives like comprehensive manual inspections. *Id.* Given the health risks to staff and the strain on already limited resources, RDC officials reasonably concluded that stricter regulations were necessary to prevent contraband from entering the facility. Courts have consistently recognized that prison officials are not required to implement alternatives that impose substantial burdens or risks on institutional resources or safety. *Overton*, 539 U.S. at 135.

In conclusion, this factor weighs in favor of finding that the regulation is reasonably related to a legitimate penological objective.

Accordingly, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** and that all claims against Defendants be **DISMISSED WITH PREJUDICE**.

## Conclusion

For the above-assigned reasons,

**IT IS RECOMMENDED** that the Motion for Summary Judgment [doc. # 22] filed by Defendants Warden Johnny Hedgemon and Assistant Warden Russell be **GRANTED** and all claims against Defendants be **DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for an extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 3rd day of January, 2025.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE